IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAYOR AND CITY COUNCIL          *
OF BALTIMORE,                   *
                                *
        Plaintiff,              *
                                *
        v.                      *        Civil No. JFM 07-320
                                *
VONAGE AMERICA INC.,            *
                                *
        Defendant.              *
                             *****

## OPINION

Plaintiff Mayor and City Council of Baltimore ("the City") has brought suit against

defendant Vonage America Inc. ("Vonage") pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-

403,[1] for a declaratory judgment that the City's Telecommunications Tax applies to Vonage.

(Compl. ¶¶ 1, 14-18.)  In addition, under Maryland common law and Md. Code Ann. Art. 24 § 9-

704,[2] the City requests that this court order Vonage to pay all amounts that it owes to the City

under the City's Telecommunications Tax, including interest and penalties.  (Compl. ¶¶ 1, 19-

28.)  Vonage has filed a counterclaim requesting that this court enter a judgment declaring, *inter*

*alia*, that it is not subject to the City's Telecommunications Tax.  (Answer and Countercl. at 5.)

Plaintiff and defendant have filed cross-motions for summary judgment, and the respective

opposition briefs have followed.  For the reasons detailed below, I will grant plaintiff's motion

---

[1] Md. Code Ann., Cts. & Jud. Proc. § 3-403(a) provides: "Except for the District Court, a court of records within its jurisdiction may declare rights, status, and other legal relations whether or not further relief is or could be claimed.  An action or proceeding is not open to objection on the ground that a declaratory judgment or decree is prayed for."

[2] Md. Code Ann. Art. 24 § 9-704 provides: "Within the period allowed in § 9-723 of this subtitle [seven years], an action to collect tax imposed under this article may be brought in a court of competent jurisdiction."

and deny defendant's motion.

I.

The evidence on the summary judgment record is as follows.  The City's

Telecommunications Tax, which became effective on August 1, 2004, provides: "A tax is levied

and imposed on each person who leases, licenses, or sells a telecommunications line to any

customer: (1) for wired service, whose billing address or fixed service address is in the City; or

(2) for wireless service, whose place of primary use is in the City."[3]  Baltimore City Code (the

"Code"), Art. 28 § 25-2.  The Code defines "telecommunications line" as "a wired or wireless

connection, identifiable by a unique telephone number, to an exchange, wireless, or other

telecommunications service."  Art. 28, § 25-1(e).

Vonage is a Delaware corporation qualified to do business in Maryland that offers a

communications service known as "Digital Voice."  (Pl.'s Mem. Ex. 1, Martinez Dep. 11:12-15,

Sept. 25, 2007.)  The service provides real-time, two-way voice communications of telephonic

quality using a technology referred to as Voice over Internet Protocol ("VoIP").  (*Id.* 11:16-20.)

Vonage assigns each of its subscribers a unique telephone number from the North American

Numbering Plan.  (*Id.* 36.)  While Vonage customers relevant to this action may not have a fixed

service address, they do have a fixed billing address in Baltimore City.  (*Id.* 14:3-8.)  Regardless

of where these Vonage customers utilize their VoIP service, they are billed at only this fixed

location.  (*Id.* 14:9-21.)

To use Vonage's service, subscribers must have a broadband connection to the internet.

(*Id.* 17, 20.)  Vonage provides its subscribers with a terminal adapter ("TA") routing device that

---

[3] A "telecommunications line" billed to an address within the City of Baltimore is taxed at a rate of $3.50 per month.  Art. 28, § 25-3.

connects to the internet to access its service through the use of established protocols.[4]  (*Id.* 17:18-18:9, 19:12-20:14.)  To place a Vonage call to a non-Vonage subscriber, the Vonage subscriber dials the telephone number of a non-Vonage subscriber anywhere in the country using the number pad on the TA device or the number pad on his or her own telephone that is connected to the TA device.[5]  (*Id.* 28, 111.)  The TA device then generates and sends a Session Initiation Protocol ("SIP") message, containing the number that is being called and the number that is placing the call, to a Vonage "proxy server" to inform the server that a connection is alive and operating at a certain location.[6]  (*Id.* 28:9-15, 110:6-11, 111:13-18.)  Upon receiving the SIP message, the Vonage proxy server authenticates the numbers and conducts a "route look-up" to determine which Vonage "gateway" should handle the request.[7]  (*Id.* 28:15-20, 111:22-112:6.)  After the proper gateway has been located, the proxy server transmits the request to the gateway; this occurs entirely over the internet with no telephone wires or telephone lines involved in the process.  (*Id.* 28:15-20, 115:1-4.)

---

[4] Vonage's customers are able to obtain a TA either directly from Vonage or from other retail providers, such as Best Buy.  (Wrightington Aff. ¶ 3.)  The standard Vonage TA device contains a built-in telephone with a handset and a number pad for dialing telephone numbers.  (Martinez Dep. 111:4-7.)  In some cases, the Vonage subscriber will connect his or her own telephone device to the TA device for the purpose of dialing a number.  (*Id.*)  As a third option, Vonage subscribers can install certain software on their computers that allows their computer to be used as a telephone.  *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1298-99 (Fed. Cir. 2007).

[5] The subscriber's TA can be connected to a modem at any physical location where an internet connection exists.  (Martinez Dep. 120:14-19).  Thus, Vonage is "nomadic" and a Vonage subscriber may take his or her TA to many locations.  (Vonage Interrog. No. 1.)

[6] This process, known as "registering," occurs entirely over the internet without the use of telephone lines or telephone wires.  (Martinez Dep. 110:13-18).

[7] Vonage's outbound gateways are physically located in only three different Regional Data Centers: New York, New York; Los Angeles, California; and Virginia.  (Martinez Dep. 114:20-22.)  A gateway is a computer that connects with or communicates with the Public Switched Telephone Network ("PSTN").  (*Id.* 47:12-13.)  The PSTN is an international system of public circuit-switched telephone networks based on copper wires that carries analog voice data.  Telephone service carried by the PSTN is often called "Plain Old Telephone Service" ("POTS").  *See* http://www.webopedia.com/TERM/P/PSTN.html.

The gateway's subsequent connection to the Public Switched Telephone Network ("PSTN") does, however, involve the use of telephone wires and lines, although Vonage does not directly connect telephone calls to the PSTN.  (*Id.* 115:10-116:1.)  Instead, Vonage maintains contractual agreements with different third-party carriers,[8] which are responsible for connecting, or "off-loading," the call from Vonage's gateway to the third-party carriers' telephone switches. (*Id.*)  The third-party carriers are then responsible for continuing to process the call and make the eventual connection to the PSTN.  (*Id.*)  Once the call enters the PSTN, the call travels from one PSTN switch to another until it reaches the eventual recipient of the telephone call.  (*Id.* 50:19-51:5, 115:14-116:1.)  Vonage has no involvement in the process of transferring the call to the PSTN once the call has been "off-loaded" from the Vonage gateway to one of the third-party carriers.  (*Id.* 51:6-10; 56:1-3.)  Vonage never directly connects to any telephone lines or telephone wires to complete its calls.  (*Id.* 115:10-13; Def.'s Mem. Ex. 2-3, Basic Call Processing Diagrams.)

As for inbound calls, a call placed from a "Plain Old Telephone Service" ("POTS") caller (a non-Vonage subscriber) to a Vonage subscriber is processed in the same manner as the outbound call, except in reverse order.  Specifically, a POTS caller placing a call to a Vonage subscriber from a landline phone would first connect to the PSTN through his telephone carrier. (Martinez Dep. 116.)  Once one of the several contracted third-party carriers that provides service to Vonage receives the call, the carrier sends the call to an inbound Vonage gateway,

---

[8] These third-party carriers include Transcom Enhanced Services, LLC ("Transcom"), Level 3 Communications, LLC ("Level 3"), and PacTec Communications, Inc. ("PacTec").  (Def.'s Mem. at 8.)

from which point it passes to the Vonage proxy server, and then to the Vonage TA device.[9]  (*Id.*)
Each step after Vonage receives the call occurs exclusively over the internet, in the same way
that an outbound call transmits from the Vonage TA device to the Vonage proxy server to the
Vonage gateway.  (*Id.* 117-20.)  Vonage does not connect to any telephone wires or telephone
lines in processing an inbound call.  (*Id.*)  As for Vonage-to-Vonage calls, they are not
transmitted over the PSTN, but rather carried exclusively over the internet.  (Def.'s Ex. 4,
General Call Processing Diagram.)

By letters dated September 15, 2006 and November 17, 2006, the City put Vonage on
notice that it was subject to the tax.  (Compl. ¶¶ 10-12; Answer ¶¶ 10-12.)  Vonage responded on
October 26, 2006, maintaining that it is not subject to the tax and thus refusing to pay it.  (*Id.*)

II.

Plaintiff's and defendant's cross-motions for summary judgment raise three issues: (1)
whether the City's Telecommunications Tax is a valid and enforceable excise tax or an
impermissible tax on intangible personal property; (2) assuming it is a valid excise tax, whether
Vonage "leases, licenses, or sells a telecommunications line" within the meaning of the Art. 28,
§ 25-2; and (3) whether Vonage's counterclaim should be dismissed for lack of subject matter
jurisdiction pursuant to the Tax Injunction Act, 28 U.S.C. § 1341.  I will address the
jurisdictional issue first, and the other two issues in turn.

A.

---

[9] The inbound Vonage gateways are located in one of several Regional Data Centers; none is located in
Baltimore.  (Martinez Dep. 116-17.)

(1)

The Tax Injunction Act ("TIA") provides: "The district courts shall not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  As the Fourth Circuit has explained, "[t]his broad restriction on federal court jurisdiction over state and local tax matters reflects the importance of the taxing power to the operation of state governments as well as the desire of the Congress to restrain federal courts from unduly interfering with state revenue collection."  *Collins Holding Corp. v. Jasper County, S.C.*, 123 F.3d 797, 799 (4th Cir. 1997) (citing *Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 826-27 (1997)).  As the statute's text makes clear, the TIA bars a suit challenging a state or local tax if the state or local law constitutes a "tax" for TIA purposes, and the state courts provide a "plain, speedy and efficient" remedy.[10]  *Id.*

Because the TIA "represents a recognition that states are best situated to administer their own fiscal operations," the term "tax" is subject to a "broader interpretation when reviewed under the aegis of the TIA."  *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 133-34 (4th Cir. 2000) (internal quotation marks omitted).  To determine whether a particular charge is a "tax" or a "fee," I must analyze whether the charge is for revenue raising purposes (making it a "tax"), or for regulatory or punitive purposes (making it a "fee").  *Id.* at 134.  The Fourth Circuit considers three factors in this analysis: (1) what entity imposes the charge; (2) what population is subject

---

[10] Although not clear from the statute's text, it has long been established that the TIA applies to local taxes as well as state taxes.  *See Rosewell v. LaSalle Nat'l Bank,* 450 U.S. 503, 506 (1981) (applying the TIA to a county property tax).  Likewise, although the TIA only mentions a suit "to enjoin, suspend, or restrain" state tax administration, the TIA has been interpreted broadly to bar suits for declaratory and injunctive relief, *see California v. Grace Brethren Church,* 457 U.S. 393, 407-11 (1982), and suits for refunds or monetary relief, *see Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 584 (1995).

to the charge; and (3) what purposes are served by the use of the monies obtained by the charge. *Id.*   As *Valero* has explained, the "classic tax" is "imposed by the legislature upon a large segment of society, and is spent to benefit the community at large," while the "classic fee" is "imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes, or to raise money placed in a special fund to defray the agency's regulation-related expenses."  *Id.* (internal quotation marks omitted).

I conclude that the City's Telecommunications Tax constitutes a "tax" for TIA purposes. The tax is imposed by municipal ordinance passed by a legislative body, the Baltimore City Council.  *See* Art. 28 § 25.  Furthermore, it is imposed on all entities that provide a telecommunications line to any customer for wired or wireless service with a Baltimore billing address, not on only those entities subject to regulation for regulatory purposes.  Finally, the collection of the proceeds of the Telecommunications Tax is presumably for the benefit of the citizens of Baltimore, considering that there is no regulatory designation of these tax proceeds provided in the ordinance.

Likewise, I conclude that the Maryland courts provide a "plain, speedy, and efficient" remedy for a taxpayer challenging the City's Telecommunications Tax because "the available state court remedies meet certain procedural criteria."  *Collins,* 123 F.3d at 799 (citing *Rosewell,* 450 U.S. at 521)).  As the Supreme Court has stated, "[i]n particular, a state-court remedy is a plain, speedy and efficient only if it provides the taxpayer with a full hearing and judicial determination at which she may raise any and all constitutional objections to the tax."  *Grace Brethren Church*, 457 U.S. at 411.  In the instant case, Maryland law permits a taxpayer to challenge the legality of local tax laws in two different forums: in the circuit court pursuant to

the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Proc. § 3-401 *et seq.*, and

in the Maryland Tax Court pursuant to Md. Code Ann. Tax Gen. § 3-103(a)(2).  Furthermore, the

Fourth Circuit has found that state courts of general jurisdiction that require payment of a tax

before the taxpayer can challenge the assessment in court nevertheless provides a "plain, speedy,

and efficient" remedy.  *Int'l Lotto Fund v. Va. State Lottery Dep't*, 20 F.3d 589, 593 (4th Cir.

1994) (citing *Rosewell*, 450 U.S. at 528).  Likewise, a federal court in the District of Maryland

has found that the Maryland Tax Court provides a "plain, speedy, and efficient" remedy for

challenging tax laws.  *Herron v. Mayor & City Council of Annapolis*, 388 F. Supp. 2d 565, 571-

72 (D. Md. 2005) (Quarles, J.).

(2)

　　　　Because the City's Telecommunications Tax is a "tax" and the Maryland courts provide a

"plain, speedy, and efficient" remedy, the TIA bars a claim requesting a ruling that would

"enjoin, suspend, or restrain . . . [the] collection" of the Telecommunications Tax.[11]  28 U.S.C. §

1341.  Plaintiff argues that Vonage's counterclaim - which seeks a declaratory judgment that the

City's Telecommunications Tax does not apply to its service - requests such a ruling, and thus

must be dismissed for lack of subject matter jurisdiction under the TIA.  (Pl.'s Mem. at 11-12.)

The Supreme Court has held that the TIA prohibits declaratory as well as injunctive relief that

would result in federal court interference with the assessment and collection of state taxes.

*Grace Brethren Church*, 457 U.S. at 411.  Because a ruling that the City's Telecommunications

---

[11] Plaintiff in addition argues that the principle of comity precludes federal interference in the City's collection of the Telecommunications Tax, and that no exceptions to the principle exist in the instant case.  (Pl.'s Mem. at 13-15 ("We have long recognized that principles of federalism and comity generally counsel that courts should adopt a hands-off approach with respect to state tax administration."  *Nat'l Private Truck Council,* 515 U.S. at 586).)  Because I conclude that the TIA applies, whether the principle of comity - or its exceptions - govern in the instant case is immaterial.

Tax does not apply to Vonage would enjoin the collection of the tax, I conclude that the TIA

bars Vonage's counterclaim.

(3)

Vonage argues, however, that the survival of its counterclaim for declaratory judgment is

ultimately irrelevant to the disposition of this case because "[r]egardless of whether Vonage's

counterclaim remains or is dismissed, the Court must consider and answer the exact same legal

question: whether the Telecommunications Tax applies to Vonage."  (Def.'s Mem. at 19.)  In

other words, Vonage contends that the TIA does not bar this court from asserting jurisdiction

over the *City's claim* for declaratory judgment, even if the court were to rule against the City.

Although the Federal Courts of Appeals once disagreed about the merit of Vonage's argument,[12]

the Supreme Court settled this issue in favor of Vonage's position in *Jefferson County, Alabama

v. Acker*, 527 U.S. 423 (1999).

In *Acker*, Jefferson County brought suit to collect occupational taxes from two federal

district court judges.  *Id.* at 427.  Although the defendants argued that the TIA barred federal

court jurisdiction over the suit, the Supreme Court held that "a suit to collect a tax is surely not

brought to restrain state action, and therefore does not fit the Act's description of suits barred

from federal district court adjudication."  *Id.* at 433-34.  Overruling the Second Circuit's

decision in *Keleher v. New England Telephone & Telegraph Co.*, 947 F.2d 547, 549 (2d Cir.

---

[12] Prior to *Jefferson County, Alabama v. Acker*, 527 U.S. 423 (1999), the Second Circuit held that the TIA "create[d] an absolute prohibition on federal judicial involvement in state or local revenue collection schemes," *Keleher v. New Eng. Tel. & Tel. Co.*, 947 F.2d 547, 549 (2d Cir. 1991), while the Seventh and Fifth Circuits held that the TIA did not preclude jurisdiction over claims by a state entity to enforce the collection of taxes, to force the distribution of taxes already collected, or to increase the amount of taxes to be collected, *Dunn v. Carey*, 808 F.2d 555, 557-58 (7th Cir. 1986); *Bd. of Educ. of Valley View Cmty. Unit Sch. Dist. v. Bosworth*, 713 F.2d 1316, 1319-20 (7th Cir. 1983); *Appling County v. Mun. Elec. Auth. of Ga.*, 621 F.2d 1301, 1303-04 (5th Cir. 1980); *Hargrave v. McKinney*, 413 F.2d 320, 326 (5th Cir. 1969).

1991), the Court explained: "The Tax Injunction Act was [] shaped by state and federal provisions barring anticipatory actions by taxpayers to stop the tax collector from initiating collection proceedings.  It was not the design of these provisions to prohibit taxpayers from defending suits brought by a government to obtain collection of a tax." *Id.* at 435.  The Court held that the TIA, "as indicated by its terms and purpose, does not bar collection suits, nor does it prevent taxpayers from urging defenses in such suits that the tax for which collection is sought is invalid." *Id.*

Accordingly, I conclude that this court has jurisdiction over both the City's claim for declaratory judgment and the defenses Vonage asserts opposing the applicability of the City's Telecommunications Tax.

## B.

I turn next to the issue of whether the City's Telecommunications Tax is a valid and enforceable excise tax or an impermissible tax on intangible personal property.  The Maryland General Assembly has granted the City "the power to tax to the same extent as the State of Maryland has or could exercise said power within the limits of Baltimore City as part of its general taxing power; and to provide by ordinance for the imposition, assessment, levy and collection of any tax or taxes . . . ."  Baltimore City Charter, Art. II, § 40(a).  However, the Baltimore City Charter explicitly denies the City the power to impose any tax upon intangible personal property.[13]  *Id.* at § 40(b).  Plaintiff argues that the City's Telecommunications Tax is a

---

[13] Baltimore City Charter, Art. II, § 40(b) provides: "The Mayor and City Council of Baltimore shall not have the power to impose any tax upon intangible personal property . . . ."

valid exercise on the privilege of providing a "telecommunications line."[14]  (Pl.'s Mem. at 5

(citing Art. 28, § 25-2).)  By contrast, Vonage argues that because it purportedly "does not

engage in the business of leasing, licensing, or selling telecommunications lines," the City's

Telecommunications Tax, "as applied to Vonage, has the effect of being imposed on each unique

[intangible] telephone number[15] assigned by Vonage to its subscribers" in violation of the

Baltimore City Charter, Art. II, § 40(b).  (Def.'s Mem. at 11.)

      In determining whether a tax is an excise tax or an intangible personal property tax,

Maryland courts consider three factors: (1) the label given the tax by the legislative body; (2) the

"actual operation and practical effect" of the tax; and (3) "the methods used to impose the taxes

[and] to fix their amount."  *Waters Landing Ltd. P'ship v. Montgomery County*, 650 A.2d 712,

716-17 (Md. 1994) (internal quotation marks omitted).  An excise tax is "a tax imposed upon the

performance of an act, the engaging in an occupation, or the *enjoyment of a privilege*," while a

property tax is "a charge on the owner of property by reason of his ownership alone without

regard to any use that might be made of it . . . ."  *Id.* at 717 (emphasis in original).

      Defendant argues that the City's Telecommunications Tax is not a valid excise tax for

---

[14] The City also argues that its Telecommunications Tax is constitutional.  (Pl.'s Mem. at 5 (citing *Weaver v. Prince George's County*, 379 A.2d 399, 407 (Md. 1977) (there is a "presumption of constitutionality accorded legislative enactments in the area of revenue and taxation"); *Goldberg v. Sweet*, 488 U.S. 252, 263 (1989) (telephone company can be required to pay excise tax determined as a percentage of the amount billed the consumer, where tax is imposed on calls billed to an address in the taxing jurisdiction)).)  Defendant has not opposed the Telecommunications Tax's constitutionality, nor have I found any reason to find the tax unconstitutional on its face.

[15] Defendant persuasively argues that a telephone number is an intangible.  (Def.'s Mem. at 11 (citing *Universal Tube & Rollform Equip. Corp. v. YouTube, Inc.*, 504 F. Supp. 2d 260, 268 (D. Ohio 2007) (stating that a "domain name is an intangible object, much like a street address or a telephone number . . ."); *Dial Temporary Help Serv. v. Shrok*, 946 F. Supp. 847, 853-54 (D. Or. 1996) (court stating that it was "unaware of any Oregon cases holding that an intangible, such as a telephone number, can be the subject of a claim for replevin."); *United States v. David*, 756 F. Supp. 1385, 1389 (D. Nev. 1991) (noting that courts have recognized that intangible items, such as telephone numbers, may be seized within the meaning of the Fourth Amendment); *Moore v. Brewer*, 259 B.R. 440, 451 (D. Ga. 2000) (stating that the intangible assets included the telephone numbers used by the debtor).

two reasons.  First, defendant submits that the Telecommunications Tax is not a tax on the enjoyment of a privilege, but rather on the ownership of property.  (Def.'s Mem. at 12 n.8, 14 n.9.)  Accordingly, defendant asserts that the Maryland Tax Court's holding in *T-Mobile USA, Inc. v. Dep't of Fin. for Baltimore City*, Nos. 05-MI-00-PP67 thru 0070 and 05-MI-00-0100 thru 0103, 2006 Md. Tax. LEXIS 4, at *5-6 (Md. Tax Feb. 7, 2007), "was simply mistaken."  (Def.'s Mem. at 12 n.8.)  *T-Mobile USA* held that the City's Telecommunications Tax (Art. 28, § 25-2) on mobile communications service was not a sales tax, but instead an excise tax on "on the privilege of furnishing or selling a wireless line."  *Id.* at *5.  The court explained that "furnishing or providing the wireless line is the relevant taxable event for purposes of this [excise] tax . . . Once the line is provided or furnished, whether through a sale or otherwise, the [excise] tax is triggered."  *Id.* at *6.

Defendant argues that "[t]here is no language in the City's Telecommunications Tax to suggest that it is being imposed on the privilege or providing of wireless communications, and when the City does intend to tax a privilege, it will clearly say so."  (Def.'s Mem. at 12 n.8 (citing Baltimore City Code, Art. 28, § 22-2 (Baltimore City tax on parking expressly stating that a "tax is levied and imposed on the *privilege* of parking a motor vehicle . . . .") (emphasis added)).)  According to defendant, *T-Mobile USA* conceded that the Telecommunications Tax was a charge on the ownership of property in finding that the Telecommunications Tax is "[a] flat tax on a telephone line, which does not vary depending on customer usage . . . ."[16] (*Id.* (citing *T-Mobile USA,* 2006 Md. Tax. LEXIS 4, at *6).)  Defendant contrasts *Waters Landing*, which

_____

[16] The full sentence in *T-Mobile USA* reads: "A flat tax on a telephone line, which does not vary depending on customer usage, *is an excise tax* rather than a sales tax under Maryland law."  *T-Mobile USA,* 2006 Md. Tax. LEXIS, at *6 (emphasis added).  Defendant acknowledges this, but argues that *T-Mobile USA* reached the wrong conclusion because merely owning a telephone line is not a privilege.  (Def.'s Mem. at 12 n.8, 14 n.9.)

held that a Montgomery development impact tax was a permissible excise tax, because it is "not imposed simply because the taxpayer owns the land; rather it is imposed only when the owner of land makes a particular use of the land, i.e., develops it."  (*Id.* at 14 n.9 (citing *Waters Landing*, 650 A.2d at 717).)

Defendant's contention is unpersuasive.  All three factors considered by Maryland courts support the conclusion that the City's Telecommunications Tax is a valid excise tax.  First, the Baltimore City Council's municipal ordinance expressly stated the legislative intent to impose the Telecommunications Tax on the acts of "leas[ing], licens[ing], or sell[ing] a telecommunications line," not on the ownership of property.  Art. 28, § 25-2.  Second, the actual operation and practical effect of the Telecommunications Tax is not to tax the ownership of property, but to tax the privilege of leasing, licensing, or selling a telecommunications line.  *T-Mobile USA* correctly concluded the same: "furnishing or providing the [telecommunications] line is the relevant taxable event for purposes of this tax."  2006 Md. Tax. LEXIS 4, at *6.

Third, the methods used to impose and fix the Telecommunications Tax are those of an excise tax, not a property tax.  *Waters Landing* explained that "where a tax is levied directly by the Legislature without assessment and is measured by the extent to which a privilege is exercised by a taxpayer without regard to the nature of value of his assets, it is an excise [tax]."  *Waters Landing*, 650 A.2d at 717.  Here, as *T-Mobile USA* held, the Telecommunications Tax is "[a] flat tax on a telephone line, which does not vary depending on customer usage . . . ."  2006 Md. Tax. LEXIS 4, at *6.  Precisely because it charges a flat tax for the privilege of providing a telecommunications line, without regard to the value of the company's assets, it is an excise tax.  That the Telecommunications Tax does not vary depending on customer usage is immaterial,

because the act or privilege being taxed is the providing of the line, not the customer's act of using the line.

Defendant's second argument for why the City's Telecommunications Tax is not a valid excise tax is equally unavailing. Defendant contends that the City's reliance on *T-Mobile USA* is misplaced because Vonage, unlike T-Mobile USA, Inc., does *not* in fact furnish or provide telecommunications lines. (Def.'s Mem. at 12-13.) Ultimately, this is an argument against the application of the Telecommunications Tax to Vonage - to be considered *infra* as the final issue on summary judgment - not an argument against the validity of the excise tax itself. Accordingly, I conclude that the City's Telecommunications Tax is a valid excise tax, and will turn to the final issue before the court: whether Vonage "leases, licenses, or sells a telecommunications line" within the meaning of the Art. 28, § 25-2.

C.

The City's Telecommunications Tax states in relevant part: "A tax is levied and imposed on each person who leases, licenses, or sells a telecommunications line to any customer . . . for wired service, whose billing address or fixed service address is in the City . . . ." Art. 28 § 25-2. The Code defines "telecommunications line" as "a wired or wireless connection, identifiable by a unique telephone number, to an exchange, wireless, or other telecommunications service." Art. 28, § 25-1(e). Vonage admits "that it provides VoIP service to persons with billing addresses in Baltimore City," (Vonage Interrog. No. 1), and assigns its customers unique telephone numbers from the North American Numbering Plan to enable its customers to receive calls from other users of the PSTN. (*Id.* No. 2; Martinez Dep. 35:19-22.) Thus, the only issue is whether Vonage "leases, licenses, or sells a [a wired or wireless connection . . . to an exchange, wireless, or other

telecommunications service] . . . for wired service."  Art. 28, §§ 25-1(e), 25-2.

Vonage submits that while it "*uses* services offered by other providers . . ., [it] does not *provide* telecommunications lines to its customers."[17]  (Def.'s Mem. at 15 (emphasis in original).)  Rather, Vonage asserts that it "merely provides its subscribers with a TA device to be hooked up to the broadband internet connection already maintained by the Vonage subscriber."  (*Id.*)  As Vonage accurately describes, once a Vonage caller's SIP message is transmitted to the proxy server and registered, the proxy server sends it to the appropriate gateway, which off-loads the call to the contracted third-party carrier for connection to the PSTN.  (*Id.* at 15-16.)  Vonage emphasizes that all of these steps occur "entirely over the internet with no telephone wires or telephones lines involved in the process."  (*Id.* at 15.)  In contrast, wired and wireless connections are used *only after* the third-party carrier connects the call to the PSTN and eventually to the recipient of the call.  (*Id.* at 16.)  Accordingly, Vonage argues, "the contracted third-party telephone carriers, *not Vonage*, are responsible for providing the wired and/or wireless connections required for completion of a Vonage call."  (*Id.* (emphasis in original).)

The City makes two arguments in opposition.  First, the City argues that Vonage is subject to the Telecommunications Tax because it resells telecommunications lines at "retail"

---

[17] Vonage has, in a supplemental letter, cited *Vonage Holdings Corp. v. Nebraska Public Service Commission*, No. 4:07CV3277, 2008 WL 584078 (D. Neb. Mar. 3, 2008), in support of its position.  In that case, the court granted Vonage's motion for a preliminary injunction to prevent defendant from imposing upon Vonage an obligation to assess and collect a Nebraska universal service fee from Vonage's customers.  *Id.* at *1.  The court relied primarily on a 2004 Federal Communications Commission ("FCC") order, which preempted state regulation of Vonage's Digital Voice product because it could not "'be separated into interstate and intrastate communications for compliance with [state] requirements without negating valid federal policies and rules.'"  *Id.* at *3 (citing *In the Matter of Vonage Holdings Corp.*, 19 F.C.C.R. 22404, ¶ 1 (Nov. 12, 2004)).  The court also relied on *Vonage Holdings Corp. v. Minnesota Public Utilities Commission*, 394 F.3d 568, 569 (8th Cir. 2004), which affirmed a Minnesota district court's preliminary injunction based on the same 2004 FCC order.  *Id.* at *5.  Because *Nebraska Public Service Commission* did not address whether Vonage leases, licenses, or sells a telecommunications line, however, I conclude that its holding is not relevant to the issue in the instant case.

that it had purchased "wholesale" from third-party carriers.  (Pl.'s Opp'n at 9-10.)  Specifically,

the City describes Vonage's contract with third-party carriers as a "wholesale purchase" of a

wired connection, and the sale of "connectivity with and across the PSTN" to customers as the

"retail" sale of that wired connection.  (*Id.* at 9; Pl.'s Mem. at 7-8.)  According to the City:

> No distinction is made under the [Baltimore City] Ordinance between companies that
> physically construct their own networks, . . . and those like Vonage that provide a
> combination of their own components (*i.e.* TA devices, proxy servers and gateways) with
> wholesale components [from third-party carriers].  The Tax applies to sellers of the voice
> connection service regardless of how the seller procures the connections.[18]

(Pl.'s Opp'n at 9.)

Second, the City disputes that Vonage's service "operat[es] in a digital system entirely

over the internet."[19]  (Pl.'s Opp'n at 9.)  Although "Vonage attempts to distinguish itself as a

digital voice company operating over the internet as opposed to a telephone provider on the

PSTN[,]" the City submits that several characteristics of Vonage's system are actually similar to

traditional telephone providers.  (*Id.*)  Specifically, the City asserts that Vonage's TA devices

convert analog copper wire signal to digital signals, and that Vonage relies on the partly copper

portions of the PSTN to complete its customers' calls.  (*Id.* at 9-10.)  The City argues that, like

---

[18] In support of this contention, the City cites the Supreme Court's recognition of three strategies by which competitors may provide local telephone service under the Telecommunications Act of 1996: (1) build its own network to replace or supplement the network of the incumbent; (2) buy and resell "telecommunications service" at wholesale; and (3) between these extremes, lease certain of an incumbent's "network elements," which the incumbent has the duty to provide "on an unbundled basis" at terms that are reasonable.  *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 491-92 (2002).

[19] The City also argues that simply because "Vonage relies on the internet for a portion of the transmission of its customers voice traffic does not exempt it from the definition of 'telecommunications lines' under the Ordinance.  Although Congress enacted laws restricting local authority to tax internet access, it specifically excluded voice services, such as Vonage's, that utilize internet protocol."  (Pl.'s Opp'n at 11.)  The Internet Tax Freedom Act Amendments Act of 2007, P.L. 110-108, § 1105(5)(D), supports the City's position: "Internet access . . . does not include voice . . . services . . . that utilize Internet protocol or any successor protocol and for which there is a charge . . . ."

Vonage's service, most telephone networks and telecommunications are provided over a combination of digital and traditional telephone lines.  (*Id.* at 10 (citing *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers ("FCC Triennial Review Order")*, 2003 WL 22175730, 18 F.C.C.R. 19020 (2003), ¶¶ 42-48 and 214-221 (discussing widespread deployment of digital transmission and packet switching in local telephone exchange networks).)  Furthermore, the City points out that providers of two-way services using both digital and analog transmission, particularly VoIP providers, have repeatedly been treated as providers of telecommunications by the Federal Communications Commission ("FCC").  (*Id.* (citing *Vonage Holdings Corp. v. FCC,* 489 F.3d 1232, 1235 (D.C. Cir. 2007) (upholding FCC ruling that VoIP carriers were providers of telecommunications services for purposes of 47 U.S.C. § 254(d)).[20]  For these reasons, the City contends, the Telecommunications Tax draws no distinction between providers of digital and traditional telephone connections.

Vonage replies that there is no support in the record that it "resells telephone connections to the PSTN."  (Def.'s Opp'n at 3.)  Rather, Vonage argues that it "has no tangible telecommunication lines of its own and, to the extent it has contractual arrangements with third-party carriers that own such lines, it does *not* obtain rights to those lines that it transfers, or purports to transfer, to Vonage's customers."  (*Id.* (emphasis in original) (citing Wrightington

---

[20] The City also cites other FCC orders treating VoIP providers as providers of telecommunications.  *See In the Matters of IP-Enabled Services Access to Telecommunications Service, Telecommunications Equipment and Customer Premises Equipment by Persons with Disabilities*, 2007 WL 1744291, 22 F.C.C.R. 11275 (2007) (extending disability access and related requirements to VoIP providers); *In the Matters of IP-Enabled Services E911 Requirements for IP-Enabled Service Providers*, 2005 WL 1323217, 20 F.C.C.R. 10245 (2005) (requiring providers of VoIP service to supply enhanced 911 capabilities); *In the Matter of Telephone Number Requirements for IP-Enabled Services Providers*, 2007 WL 3306343, F.C.C.R. 19531 (extending local number portability requirements to VoIP providers); *In the Matter of AT&T's Phone-to-Phone IP Telephony Services*, 2004 WL 856557, 19 F.C.C.R. 7457 (2004) (calls transported over internet subject to access charges).

Aff. ¶¶ 4-5).)  As for the City's second argument, Vonage responds that "the only issue in this case is whether Vonage 'leases, licenses, or sells a telecommunications line' to a customer under the City's Ordinance, and the City's discussion of how Vonage's service may be treated under other very different statutes is irrelevant."  (*Id.* at 4 n.7.)  Finally, Vonage points out that it is a "'well-settled Maryland rule that . . . a law imposing a tax liability is construed most strongly . . . against the taxing authority.'" (*Id.* at 2 n.2 (citing *United States v. Montgomery County*, 761 F.2d 998, 1001-02 (4th Cir. 1985)).)

The issue is an extremely close one.  However, I find the City's position to be the more persuasive one.  In *Vonage Holdings Corp.*, 489 F.3d at 1235, the D.C. Circuit upheld the FCC's broad interpretation of the phrase "provider of interstate telecommunications," and thus concluded that the Commission has statutory authority under 47 U.S.C § 254(d) of the Telecommunications Act of 1996 to require VoIP providers to make Universal Service Fund contributions.[21]  The Commission concluded that the verb "provide" was broad enough to include the act of supplying a good or service as a component of a larger, integrated product.[22] *Id.* at 1239.  Accordingly, because the Commission found that VoIP does in fact include telecommunications as a component, it held that VoIP was a "provider of telecommunications."[23] *Id.*  The Commission explained that interconnected VoIP services provide such transmission by

---

[21] I recognize that the Court of Appeals was only deciding whether the Commission's interpretation of section 254(d) was *permissible*.  *Vonage Holdings Corp.*, 489 F.3d at 1240.  I not only agree that the Commission's interpretation was permissible, but also find it well reasoned and sound.

[22] For example, the court noted that under the Commission's interpretation, McDonald's provides beef, as well as hamburgers, and *The Washington Post* provides ink, as well as newspapers.  *Vonage Holdings Corp.*, 489 F.3d at 1239.

[23] The Telecommunications Act of 1996 defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  47 U.S.C. § 153(43).

virtue of their interconnection with the PSTN:

> [B]y definition, interconnected VoIP services are those permitting users to receive calls from and terminate calls to the PSTN . . . . [W]e find interconnected VoIP providers to be 'providing' telecommunications regardless of whether they own or operate their own transmission facilities or they obtain transmission from third parties.  In contrast to services that merely use the PSTN to supply a finished product to end users, inteconnected VoIP supplies PSTN transmission *itself* to end users.

*Id.* at 1239 (citing *In re Universal Service Contribution Methodology*, 21 F.C.C.R. 7518, 7539-40 (2006)) (emphasis in original).

Analogously, in the instant case, the City argues that Vonage includes "telecommunications lines" as a component of its "larger, integrated product."  *Vonage Holdings Corp.*, 489 F.3d at 1239.  Vonage concedes that in all calls other than those between two Vonage subscribers, a wired connection is required to complete the call.  (Martinez Dep. 115-20.) Vonage also admits that it "purchases local telephone service from local exchange carriers to enable access to its network from the [PSTN]."  (Vonage Interrog. No. 2.)  Although Vonage denies that it transfers to its customers the rights it obtains from the third-party carriers that own the wired connection, a transfer of rights is not necessary to conclude that Vonage sells telecommunications lines.  What is critical is that Vonage is selling a service that *includes* the use of a "telecommunication  line" within the definition of the Telecommunications Tax.  *Cf. Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1301 (Fed. Cir. 2007) ("[T]he conversion of analog voice signals to digital signals [is] required to operate a *hybrid system* such as Vonage's, where calls are transmitted through the internet but also *through normal telephone lines* when the called party is not a Vonage subscriber.") (emphasis added).

Furthermore, in establishing the Telecommunications Tax as an excise tax on the privilege of selling a "wired or wireless connection," the Baltimore City Council must have

reasonably contemplated that a company that enabled a customer to complete a telephone call over a wired connection would be taxed.  In the instant case, because every call that a Vonage subscriber makes to or receives from a non-Vonage subscriber must travel over a wired connection, it is reasonable to conclude that Vonage sells a telecommunications line to its subscribers.  Vonage's contention that it merely "uses" the wired connection offered by "contracted third-party telephone carriers, [which] are responsible for providing the wired . . . connections required for completion of a Vonage call," (Def.'s Mem. at 15-16), misstates the reality of the situation.  Although these third-party carriers provide the wired connection *to Vonage*, it is Vonage, *not* these carriers, which provides this connection to Vonage's customers.

Vonage's final argument  - that collection of the Telecommunications Tax from Vonage would constitute an "unfair double tax" - is also unavailing.   (Def.'s Mem. at 16 n.11.) Although Vonage assumes that the contracted third-party carriers are taxed for "telephone lines leased, licensed, or sold by one of [them] to a Vonage customer," (*Id.* at 16 n.11, 15), there is no evidence in the record supporting this conclusion.  It seems likely that because Vonage, not these third-party carriers, provides Vonage's subscribers with the unique telephone number required for service, only Vonage would be taxed under the Telecommunications Tax for providing a "telecommunications line" to that customer.  *See* Art. 28, § 25-1(e) (defining "telecommunications line" as "a wired or wireless connection, *identifiable by a unique telephone number*, to an exchange, wireless, or other telecommunications service") (emphasis added).

Even assuming, however, that these third-party carriers are also taxed under the City's Telecommunications Tax, this would not constitute an impermissible "double tax."  Maryland courts have found an impermissible double tax only when one party is taxed twice on the same

property for the same purpose.  *See, e.g., CSX Transp., Inc. v. State Dep't of Assessments and Taxation*, Nos. 698, 745, 1992 WL 110098, at *5 (Md. Tax May 15, 1992) ("[T]he imposition of a tax twice upon one person for the same purpose because of his ownership of a particular piece of property would be a double tax . . . .") (citing *Williams Co. v. Baltimore City*, 63 A. 562, 565 (Md. 1906)).  Accordingly, even if both Vonage and the respective third-party carrier were taxed under the Telecommunications Tax, this would not be an impermissible "double tax."[24]

For the foregoing reasons, I conclude that, except as to calls between Vonage subscribers, Vonage "leases, licenses, or sells a telecommunications line" within the meaning of Art. 28, § 25-2, and thus is required to pay the City's Telecommunications Tax.  A separate order to that effect is being entered herewith.

Date:   April 16, 2008                    /s/_____
                                          J. Frederick Motz
                                          United States District Judge

---

[24] Even if the Telecommunications Tax as applied to both Vonage and the respective third-party carrier were considered a "double tax," "[i]t is a well settled rule that a State is not barred by the U.S. Constitution from assessing a double tax."  *Isikoff v. Comptroller of the Treasury*, No. 609, 1978 WL 1512, at *1 (Md. Tax July 26, 1978) (citing *Fort Smith Lumber Co. v. Arkansas*, 251 U.S. 532, 533 (1920) ("The Fourteenth Amendment no more forbids double taxation than it does doubling the amount of tax; short of confiscation or proceedings unconstitutional on other grounds.")); *see also King v. United States*, 79 F.2d 453, 455 (4th Cir. 1935) ("[D]ouble taxation, if clearly the intention of Congress, is concededly not unconstitutional and may properly be collected.")  The Maryland Constitution also does not prohibit double assessment of an indirect tax or an income tax on identical income. *Isikoff*, 1978 WL 1512, at *1 (citing *Oursler v. Tawes*, 13 A.2d 763, 768 (Md. 1940)).

-21-